**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS DISTRICT LODGE 15, on behalf of itself and all those similarly situated, | _____ Civ. _____ |
| | **CLASS ACTION COMPLAINT** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| v. | |
| METROPOLITAN LIFE INSURANCE COMPANY, | |
| **Defendants.** | |

Plaintiff International Association of Machinists and Aerospace Workers, District Lodge 15 ("Plaintiff" or "IAM District 15"), through its undersigned attorneys, brings this action as a class action on behalf of itself and all others similarly situated, and states and alleges as follows:

## INTRODUCTION

1.      Plaintiff purchased a Group Insurance Policy from Defendant Metropolitan Life Insurance Company ("Defendant" or "MetLife") to provide basic term life and accidental death and dismemberment insurance to certain of Plaintiff's officers and employees. In this lawsuit, Plaintiff seeks to represent itself and all other persons and entities who purchased, renewed, or paid premiums on life insurance issued by MetLife within the past six years.

2.      Plaintiff alleges that Defendant violated New York Insurance Law 4226 by engaging in various "shadow insurance" transactions in connection with its life insurance business, which were kept secret from its principal regulator, its credit rating agencies, and its customers, and which had the effect of misleading them as to its financial condition.

1

3.     These shadow insurance transactions have drawn the ire of Defendant's home state insurance regulator, the New York Department of Financial Services ("NYDFS"), and also have received scrutiny in a research paper published by the Federal Reserve Bank of Minneapolis. *See* Ralph S.J. Koijen & MotohiroYogo, *Shadow Insurance* (Nov. 2014) ("FRB Staff Report"), *available at* https://www.minneapolisfed.org/research/staff-reports/shadow-insurance (last visited February 2, 2015).

4.     Specifically, Defendant engaged in certain reinsurance transactions with captive affiliate entities in jurisdictions that have significantly lower reserving and reporting requirements than New York in order to artificially inflate its reported risk-based capital ("RBC"), boost its credit ratings, and evade the capital requirements imposed by New York law.[1] The NYDFS has described these transactions and practices as a "complex shell game" that does not fully transfer the risk from Defendant to its captive reinsurance companies and does not comply with applicable law.   Nevertheless, Defendant takes a reserve credit as though the reinsurance transactions meet applicable legal requirements.   Defendant is then free to divert these reserves for its own purposes, placing policyholders at risk.

5.     In June 2013, the NYDFS released a report titled "*Shining a Light on Shadow Insurance: A Little-Known Loophole That Puts Insurance Policyholders and Taxpayers at Greater Risk*" (the "NYDFS Report"), which is attached hereto as Exhibit 1.   In this Report, the NYDFS set forth its finding, based on an eleven-month investigation, that seventeen New York life insurance companies, including Defendant and its non-New York affiliate insurers, were

---

[1]Among the most important subjects of insurance regulation is the regulation of insurance companies' financial stability and condition.   Regulators in New York and other states have long required that life insurers maintain reserve liabilities sufficient to cover their expected claims for benefits under outstanding life insurance policies. These reserves are further required to be held in the form of safe and strong assets to ensure financial stability.

2

engaging in certain types of prohibited transactions and reporting practices. Specifically, Defendant was identified in the NYDFS Report as "Case 1."

6.      After the NYDFS Report was released, the Federal Reserve Bank of Minneapolis published a separate FRB Staff Report that also expressed concern about the risks posed by these shadow insurance transactions. A copy of this FRB Staff Report is attached as Exhibit 2. According to the report, "[t]he potential risk of shadow insurance is difficult to assess because the financial statements of shadow reinsurers are confidential to the public, rating agencies, and even to insurance regulators outside their state of domicile .*Id.* at 2. The report endeavored to quantify the financial risk of shadow insurance, and concluded that the adjustments "reduced risk-based capital by 53 percentage points and ratings by 3 notches for the average company using shadow insurance." *Id.* Furthermore, "[t]he adjusted ratings imply an average 10-year default probability that is 3.5 times higher than that implied by the reported ratings." *Id.* at 2-3.Moreover, the FRB Staff Report identified MetLife as a "case study." *Id.* at 8 & Table 3.

7.      When purchasing life insurance and selecting MetLife as an insurance provider, individual and group life insurance purchasers – such as Plaintiff – use MetLife's credit and insurance ratings, as well as the insurance company's assurances of financial strength (including, without limitation, the assurances made on MetLife's website), and assume that MetLife is in compliance with all applicable financial and legal requirements.

8.      By engaging in shadow insurance transactions that were not properly or adequately disclosed to rating agencies, the NYDFS, or individual or group purchasers of life insurance policies, MetLife misled its rating agencies, the NYDFS, and its customers as to its financial condition and its risk of default on policies.

9.      New York Insurance Law § 4226 prohibits insurers from making misleading

3

statements or misrepresentations as to their financial condition or their legal reserve systems. As a result of its shadow insurance transactions, and its material misrepresentations and omissions, Defendant systematically violated New York Insurance Law § 4226.

10.     Plaintiff, as an aggrieved party, brings this action to remedy these violations, prohibit Defendant from engaging in further such violations, and obtain premium refunds as a penalty and other relief for itself and other Class members in accordance with New York Insurance Law § 4226.

## PARTIES

11.     IAM District 15 is a district-level labor union representing ten local unions comprised of approximately 19,000 active and retired members in a number of different industries.  Plaintiff's principal offices are located in Brooklyn, New York.  The local unions in IAM District 15, and the members who comprise them, are located in Massachusetts, New Jersey and New York.  In addition to its principal office in Brooklyn, New York, Plaintiff maintains offices in Englewood Cliffs, New Jersey; Lyndhurst, New Jersey; Buffalo, New York; Boston, Massachusetts; Philadelphia, Pennsylvania; and Washington, D.C.

12.     In August 2010, Plaintiff obtained a Group Insurance Policy from Defendant to provide certain of Plaintiff's officers and employees with Basic Term Life & Accidental Death and Dismemberment Insurance from Defendant.  Plaintiff renewed this group policy in August of each year through the present.

13.     MetLife is a life insurance company organized and existing under the laws of the State of New York.  Defendant's principal place of business is 200 Park Avenue, New York, NY 10166-0188.  In 2000, Defendant underwent a demutualization and converted to a stock company.  With the demutualization, Defendant became a wholly owned subsidiary of MetLife,

4

Inc.

14.      Defendant has authorization from the State of New York to conduct its life insurance business in New York.  Defendant is licensed to do business in all fifty states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, and the Commonwealth of North Mariana Islands.

## JURISDICTION AND VENUE

15.      This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $5 million and the class is comprised of more than 100 members.

16.      Plaintiff is a district-level labor union in New York comprised of local-level labor unions in New York, New Jersey, and Massachusetts.  The members of these local unions are comprised mostly of citizens of New York, New Jersey and Massachusetts.  Additionally, based on MetLife's annual statutory reports, the geographic distribution of premiums indicates that more than two-thirds of the members of the putative class reside outside of New York.

17.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff's principal place of business is located in this District and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this District.

## BACKGROUND REGARDING LIFE INSURANCE

18.      Life insurance typically provides money to beneficiaries after a loved-one who has life insurance dies.  The coverage can help pay funeral expenses and estate taxes, replace the decedent's income with a non-taxable death benefit, or more generally reduce the financial burden on the family of the decedent.  Life insurance also takes the form of various annuity and disability products.

19.     Roughly 1,000 insurance companies sell life insurance in the United States, but many are members of groups of insurance companies and do not compete with each other.  There are approximately 300 insurance groups in the United States.

20.     Insurance companies within insurance groups are typically connected in ownership and management.   The separate companies in an insurance group facilitate efficiencies in marketing insurance products through different channels, meeting regulatory and licensure requirements of particular states, and/or achieving other organizational goals of the group.[2]

21.     Insurers and their parent companies share strong financial ties, as do the captive reinsurers[3] and other operating subsidiaries of the parent.  The result of these close relationships is that the solvency and financial condition of individual operating subsidiary insurance companies is highly correlated to the solvency and financial condition of their parent corporations.

22.     Consumers can purchase life insurance from insurance companies either as an "individual" or as part of a "group" plan.  When buying an individual policy, the consumer selects the company and plan as well as the benefits and features that meet the needs of the consumer and his or her family.  Some consumers have life insurance available to them through

---

[2] For example, as found by a recent study on capital flows between insurance companies within an insurance group, as individual companies in the group "perform poorly [] for exogenous reasons, internal capital will flow to the [underperforming individual companies]."  *See* Greg Niehaus, *Managing Capital and Insolvency Risk via Internal Capital Market Transactions:   The   Case   of   Life   Insurers*,   June   2014,   *available at*http://www.aria.org/Annual_Meeting/2014/2014_Accepted_Papers/6E/Conf%20paper%20-%20Niehaus.pdf. Similarly, when individual companies perform well for exogenous reasons, the group's internal capital flows away from the over performing companies .*Id.*  Thus, insurance groups are able to (and do) allocate capital resources to support the various individual companies.  However, this means that when one insurer within a group performs poorly – such as participating in risky practices that undermine the insurer's solvency – other insurers within the same insurance group are susceptible to financial difficulties and potential solvency issues because their capital may be used to prop up the poorly performing insurer.

[3] As discussed *infra*, captive reinsurers are affiliates of the primary ceding insurer that are specifically formed to provide reinsurance for the primary operating company or companies in an insurance group.  The captives are formed under specific laws enacted in certain jurisdictions.

their employer or from another entity such as a union or trade association.  In such case, the entity purchases a group policy from a life insurance company that will cover certain individuals. The entity pays the premium for the group policy.

23.    In selecting an insurance company – regardless of whether the insurer is selected by an individual or by a group – purchasers consider several criteria.  Principally, the purchaser will consider the solvency and financial condition of the insurer as well as the premium cost of the policy.  The cost of policies is generally positively correlated with the perceived financial quality of the issuing insurer.

24.    In evaluating the financial condition and solvency of an insurance company, consumers and group purchasers frequently refer to and consider ratings for the insurance company assigned by ratings agencies that conduct periodic evaluations of insurance companies.

25.    Four independent agencies – A.M. Best, Fitch, Moody's and Standard & Poor's – rate the financial strength of insurance companies.

26.    Consumers and group plan purchasers, including Plaintiff, trust ratings agencies to evaluate the solvency and financial condition of insurers, and to provide important information concerning the likelihood that the insurer could default on its obligations in the future, thus making the insurer incapable of paying promised benefits.

27.    The financial condition of life insurance companies is a particularly important consideration in selecting an insurer because life insurance is a long-term product that is not guaranteed by a federal agency such as the Federal Deposit Insurance Corporation ("FDIC") which provides guarantees for bank accounts.[4]  Indeed, many life insurance products include

_____

[4] Although state guarantee associations provide a partial guarantee of life insurance policies, in the event of an insurer collapse, benefits under existing life insurance policies issued by the collapsed insurer can be cut

long-term contractual guarantees that may be promised for 30, 40 or even 50 years into the future.

28.     Because of the importance of maintaining the solvency of life insurance companies, life insurance, like other forms of insurance, is regulated by state government agencies. Typically, the insurance regulator in each life insurance company's domicile has the principal role in regulating the company's business. Thus, in Defendant's case, the NYDFS is principally charged with regulating Defendant's insurance business.

29.     State regulators ensure compliance with various insurance regulations including, without limitation, statutory reserve requirements and RBC requirements.

30.     The reserve requirements issued by state insurance regulators are based on the need to ensure that insurers are able to pay expected claims on the policies they issue. The reserves must be supported by admitted assets. Admitted assets are high-quality, liquid assets that would allow the life insurance company to pay claims on demand. Regulators specify various criteria that these assets must have in order to adequately support the reserve.

31.     The level of reserves an insurance company is required to maintain is dependent upon a variety of actuarial factors. Reserve requirements are determined using a formula prescribed by insurers' regulators. Many regulators, including in New York, add buffers to cover not only expected losses but also losses that may exceed expectations.

32.     In 2000, the National Association of Insurance Commissioners' ("NAIC") Valuation of Life Insurance Policies Model Regulation, commonly referred to as Regulation XXX, was introduced. In February 2001, Regulation XXX became effective on a rolling basis in 37 states, including New York. Regulation XXX imposes conservative assumptions and

---

substantially. Recently, for example, upon the liquidation of Executive Life Insurance Company of New York, policyholders endured substantial reductions in benefits even after the guarantee associations' contributions.

valuation methodologies for determining the level of statutory reserves, which insurers are required to hold under statutory accounting principles, for term life insurance policies. The conservative assumptions resulted in significantly higher reserve level requirements for life insurance companies than were previously maintained, and limit the financial flexibility of life insurance carriers to use admitted assets for something other than reserves.

33.     Along with Regulation XXX, Actuarial Guideline 38 (commonly referred to as Regulation or Guideline AXXX), promulgated by the NAIC and adopted by numerous states, imposes similar reserve requirements in connection with universal life insurance policies. Together, Regulations XXX and AXXX impose requirements across the most significant life insurance products. New York adopted its own version of Regulation AXXX

34.     The effect of both the NAIC and New York versions of Regulations XXX and AXXX is to increase the burdens of maintaining adequate reserves and a strong RBC ratio[5] in jurisdictions that adopted the requirements.

35.     In addition to statutory reserves, insurance regulators monitor what is known as the insurer's "risk-based capital," or RBC. The RBC is the minimum amount of capital that the insurer must hold to protect policyholders against adverse mortality events.

36.     Regulators implement the RBC requirements to provide a capital adequacy standard tied to risk, raise insurers' safety nets, create uniformity among states, and provide regulatory authority for timely action.

37.     The RBC ratio is the prime capital adequacy measure used by regulators in the United States to identify weakly capitalized life insurers. *See The Captive Triangle: Where Life*

---

[5] What is commonly referred to as the "RBC ratio" is the ratio of the insurer's total adjusted capital to the minimum amount of capital required under the regulator's formula. A higher ratio figure is indicative of a more secure institution.

*Insurers' Reserve and Capital Requirements Disappear*, Moody's Investor Service (Aug. 23, 2013) ("*Captive Triangle*").   Moreover, ratings agencies also weigh RBC ratios heavily in evaluating insurance companies' financial conditions.

38.    The RBC ratio is thus an important and material factor in a policy purchaser's choice of a life insurance company.

39.    Unfortunately, as discussed herein, the RBC ratio is susceptible to manipulation. Insurers can boost the ratio by reducing reserve liabilities.  Although such reductions can be accomplished above-board and with regulator approval through ceding risk to reinsurance companies, many life insurance companies, including Defendant, have artificially reduced their reserve liabilities without regulator approval through the types of shadow insurance transactions that are at issue in this Complaint.

## REINSURANCE IN THE LIFE INSURANCE INDUSTRY

40.    "Reinsurance" is a term commonly used to identify a transaction that indemnifies a primary insurer against loss; essentially, it is insurance for the insurer.  In the most widely accepted sense, reinsurance is understood to be the practice where a primary insurer or "ceding insurer," for a definite premium, contracts with another insurer (or insurers) to carry all or part of the risk assumed by the primary insurer in writing the original insurance policy.  The reinsurance contract does not affect the initial obligation between the insured and the primary insurer. Importantly, the ceding insurer remains obligated to pay policyholder claims in the event that the reinsurer defaults.

41.    "The four basic motives of life and annuity reinsurance are risk transfer, underwriting assistance, capital management, and tax management."  *See* FRB Staff Report at 4.

10

More generally, reinsurance is used to indemnify and protect the primary insurer against frequent or severe losses.

42.      While the principal purpose of reinsurance is to help primary insurers manage their risk capacity, recently capital management and tax management have become increasingly frequent motives for reinsurance transactions. *Id.* There are two main reasons for this trend in motivations. First, the adoption of Regulations XXX and AXXX forced life insurers to hold more capital against their life insurance positions. Second, certain states – *e.g.*, South Carolina and Vermont –and foreign jurisdictions have adopted new laws allowing life insurers to establish captive reinsurance companies in a manner that effectively circumvents the Regulation XXX and AXXX reserve requirements. *Id.*

43.      Thus, insurers have, over the last several years, increasingly used reinsurance to maximize the use of their capital (and minimize the amount required to be kept in their reserve). In theory, a primary/ceding insurer can receive a credit for reserves that the ceding insurer is otherwise required to maintain under Regulations XXX/AXXX provided that the reinsurance transaction meets regulatory requirements.

44.      To obtain this reserve credit, primary insurers may reinsure with non-affiliated (*i.e.*, third-party) reinsurers, or may reinsure with affiliated reinsurers subject to certain restrictions.

45.      In many, if not most, cases, affiliated reinsurers are "captive" reinsurers.[6] In a captive reinsurance transaction, as with other reinsurance transactions, the life insurance company cedes risks and reserves to the captive entity. However, in order for the primary insurer to receive reserve credit for the reinsurance, the captive must either be an authorized

---

[6] Captive insurance companies are formed under specific laws that prohibit them from issuing policies to individual and group purchasers directly.

reinsurer in the insurance company's state of domicile or must post collateral that meets the regulatory requirements of the insurance company's state of domicile.

46. In a reinsurance transaction, the ceding insurer remains obligated to pay policyholder claims even if the reinsurance company is unable to meet that obligation. As a result, it is imperative that the collateral used to support the reserve credit taken by the ceding insurer be of high quality and sufficiently liquid to pay claims as they come due.

47. The most common forms of collateral used for this purpose are for the unauthorized reinsurer to either maintain a trust with a United States financial institution or obtain an irrevocable and "evergreen"[7] letter of credit ("LOC") from a United States financial institution.

## CAPTIVE REINSURANCE AS A MEANS FOR CAPITAL MANAGEMENT

48. In 2002, South Carolina introduced new laws that permitted life insurers to establish captives, whose primary function was to assume reinsurance from affiliated companies for the purpose of reducing overall reserves. *See* FRB Staff Report at 5. In 2004, South Carolina introduced the captive structure of the "special purpose financial captive," and Vermont followed suit with a similar structure in 2007. *Id.* At least 26 states have adopted a version of a captive laws, eight of which have defended special purpose financial captives.[8] *Id.*

---

[7] An "evergreen" LOC has an expiration date but contains a provision – commonly referred to as an "evergreen clause" – that it may be automatically extended (*i.e.*, rolled over) for an indefinite number of periods until the issuing bank informs its beneficiary of the final expiration.

[8] In contrast to the limited number of states that are competing to attract captive insurance business, several states have examined and rejected the idea. For example, in a December 2013 report, the Maryland Insurance Administration recommended that the state forego captive legislation "because the industry has developed in ways that have caused considerable regulatory concern at the federal and state levels." Maryland Insurance Administration, *Report to Examine Methods to Establish and Properly Regulate a Captive Insurer Industry in the State of Maryland*, December 2013, available at http://www.mdinsurance.state.md.us/sa/docs/documents/news-center/legislative-information/captive-report-122013.pdf. "To become a thriving captive domicile today, a state must be willing to relax important regulatory safeguards. Attractive new domiciles are those that have a high risk appetite, demand few hurdles to formation, have low premium taxes and fees, have minimal solvency and capital requirements, and require little in the way of reporting." *Id.*

49.     Captive reinsurers provide insurance groups with significant advantages over third-party reinsurers. First, they allow the insurance group to keep the underwriting profits within the group. *Id.* Second, when the captive is set up in a favorable jurisdiction, the captive can hold less capital than required under statutory reserve regimes like Regulations XXX and AXXX. Third, when set up in a favorable jurisdiction, the financial statements of the captive are confidential to the public, rating agencies, and insurance regulators – including the primary ceding insurer's regulator. Fourth, the captive jurisdiction may allow the captive to operate under flexible financial structures that allow them to fund reinsurance transactions through either letters of credit or securitization. *Id.*

50.     Thus, while both captive reinsurers and third-party reinsurers can carry risks ceded to them by primary insurers, captive reinsurers can potentially have a bigger impact on the primary insurer's and the insurance group's bottom line.

51.     As described herein, however, many of the "advantages" provided by captive reinsurers are not permitted by the primary insurer's regulator (and for this reason, are concealed from the primary insurer's regulator).

## "SHADOW INSURANCE" IN THE LIFE INSURANCE INDUSTRY

52.     Some insurance companies and their industry lobbies believe that the reserve requirements imposed in connection with life insurance are unreasonably burdensome and unnecessary.

53.     A limited number of insurers have responded to the capital strains imposed by these statutory reserve requirements by ceding risk to offshore captive reinsurers and reinsurers domiciled in states with much looser regulations and reporting and reserve requirements through

mechanisms designed to circumvent the regulatory requirements in the insurers' home jurisdictions.

54.     To evade the allegedly overly burdensome requirements imposed by the State of New York, Defendant has engaged in reinsurance transactions using collateral that is designed to appear to its regulator and public as permissible collateral but, in fact, is insufficient to qualify for the reserve credits that it claims.

55.     In July 2012, the NYDFS initiated an investigation into the "shadow insurance" practices of certain life insurance companies that it regulated. *See* NYDFS Report at 1. The investigation was an effort to uncover certain practices of life insurers that were previously undisclosed or inadequately disclosed to the NYDFS.

56.     The NYDFS described shadow insurance as "a little-known loophole that puts policyholders and taxpayers at greater risk." *Id.* Specifically, "insurance companies use shadow insurance to shift blocks of insurance policy claims to special entities – often in states outside where the companies are based, or else offshore (*e.g.*, the Cayman Islands) – in order to take advantage of looser reserve and regulatory requirements." *Id.*[9]

57.     Following an eleven-month investigation, in June 2013 the NYDFS published a report of its findings.

58.     The report described the problem at the outset, stating:

> In a typical shadow insurance transaction, an insurance company creates a "captive" insurance subsidiary, which is essentially a shell company owned by the insurer's parent. The company then "reinsures" a block of existing policy claims through the shell company – and diverts the reserves that it had previously set aside

---

[9] In addition to these looser regulatory and reserve requirements, "most states have laws that provide for strict confidentiality on financial information related to shadow insurance." NYDFS Report at 2. "These confidentiality requirements thwart regulators from outside that state from having a full window into the risks that those [shadow insurance] transactions create."*Id.*

to pay policyholders to other purposes, since the reserve and collateral requirements for the captive shell company are typically lower . . . .

This financial alchemy, however, does not actually transfer the risk for those insurance policies because, in many instances, the parent company is ultimately still on the hook for paying claims if the shell company's weaker reserves are exhausted (a "parental guarantee"). That means that when the time finally comes for a policyholder to collect promised benefits after years of paying premiums . . . there is a smaller reserve buffer available at the insurance company to ensure that the policyholder receives the benefits to which they are legally entitled.

*Id.* at 1.

59.     The NYDFS investigation uncovered $48 billion in shadow insurance transactions engaged in by New York-based insurance companies and their affiliates. *Id.* at 2.

60.     The principal fault with these transactions is the obligation of the parent to guarantee the collateral used as support for the ceding insurer's reserve credit taken from the transaction.  By failing to disclose these parental guarantees, and by using offshore affiliated reinsurers and captive reinsurers domiciled in states that employ strict confidentiality measures concerning the captive business, MetLife and other insurers were able to evade detection of these tactics by regulators, ratings agencies, and the public.

61.     These undisclosed parental guarantees have the effect of negating all or part of the risk transfer that the reinsurance transaction would otherwise be designed to effectuate.

62.     When a parental guarantee is triggered, the parent is unlikely to be otherwise unaffected by negative financial events because it's financial condition is closely related to the financial condition of its subsidiaries.

63.     In an August 2013 Moody's report, the ratings agency noted that, in a financially stressful environment, where an insurer relies on its holding company to adequately fund its

15

reserves, the dependency by the insurer on the parent is potentially disastrous.  *See Captive Triangle* at 4 ("If the holding company were to run into financial trouble, the operating company would then lose reinsurance credit for its ceded reserves, thereby reducing its regulatory capital levels.  Should this scenario arise, it is likely that it would be very challenging for the operating company to find another solution to fund redundant reserves because problems at the holding company are frequently linked with problems at the operating company.  This dependency of an insurer on its holding company's creditworthiness could be disastrous in a stressful environment.").  This risk is not lessened when a captive reinsurer relies on the ceding insurer's parent holding company.

64.     The NYDFS investigation found that certain New York-based insurers failed to disclose the parental guarantees associated with nearly 80% ($38 billion) of the $48 billion in shadow insurance transactions in statutory, annual financial statements.  *Id.*  Even those companies that did make disclosures frequently made incomplete and inadequate disclosures of these guarantees.  *Id.*

65.     The report focused on and detailed four core practices that New York-based insurers and their affiliates had engaged in.  Of those, Defendant was identified by NYDFS as participating in two practices:[10]

_____

[10] In addition to the two practices the NYDFS connected to Defendant, the NYDFS also examined and critiqued the following practices:

     a)   **Conditional Letters of Credit**.  Conditional LOCs are letters of credit with stipulated conditions that must be met before they can be drawn upon.  Conditional LOCs are at greater risk of not being available to fund policyholder claims at times of financial stress.  For this reason, New York requires that LOCs used as collateral for purposes of reducing a primary insurer's reserve requirement must have unconditional terms; and

     b)   **Naked Parental Guarantees**.  When a captive insurance subsidiary engaging in shadow insurance practices fails to obtain a LOC – regardless whether it is conditional – and simply promises that the parent company would cover a potential loss (without identifying any specific dedicated asset or resource to pay the losses), the captive is relying on a "Naked

    a. **Two-Step Transactions**.  Two-Step Transactions ("TSTs") occur where a New York-based insurer transferred risk to a non-New York affiliate which subsequently transferred that risk to a captive subsidiary affiliated with the original New York-based insurer.  TSTs are problematic where they are used by a New York-based insurer to evade reporting its shadow insurance activity to the NYDFS.  In such case, the New York-based insurer may not report direct shadow insurance activity yet still be on the hook for losses through a parental guarantee.

    b. **Hollow Assets**.  When an affiliated captive or affiliate offshore reinsurer reports a LOC with a parental guarantee as an asset on its books, these LOCs are "Hollow Assets."  New York does not permit these undrawn LOCs to be counted as an asset.  In Missouri, Delaware, Iowa, South Carolina, Nebraska, and Vermont, unlike New York, captive reinsurers are permitted to report LOCs with parental guarantees as admitted assets on their books.

66.    *Id.* at 4-5 & 7.  These practices are discussed in more detail as to Defendant below. *See infra* at ¶¶ 81-111.

67.    The NYDFS Report was limited to examining 2011 data.  The shadow insurance activities of certain insurers did not cease, however, at the end of 2011.  Indeed, the FRB Staff Report found that these practices remained prevalent in the industry through the 2012 data as well – and specifically identified MetLife as a case study.

THE EFFECTS OF SHADOW INSURANCE

68.    The effect of the shadow insurance transactions described herein permits the primary insurer to artificially boost its RBC buffers reported to regulators, ratings agencies, investors and the broader public. *Id.* at 8.

69.    Because the nature of these shadow insurance transactions does not generate new capital or reduce the risks posed by the primary insurer's book of policies, the insurer's capital buffers appear larger than they actually are and, thus, obscure the true default risk of the insurer.

---

    Parental Guarantee."  As with Conditional LOCs and Hollow Assets, New York does not permit Naked Parental Guarantees to be used to justify a reserve reduction by the ceding primary insurer.

NYDFS Report at 4-5.

17

70.     Unfortunately, the full effect of shadow insurance transactions can be difficult to assess because "the financial statements of shadow reinsurers are confidential to the public, rating agencies, and even to insurance regulators . . . ." FRB Staff Report at 2. However, the FRB Staff Report attempted to quantify the financial risk posed by shadow insurance on the industry as a whole based on publicly available information and conservative assumptions. The FRB Staff Report found that, on average, companies engaging in shadow insurance transactions should have their reported *RBC reduced by 53% and have their rating dropped by three notches*. *Id.* & at 12."The adjusted ratings [accounting for shadow insurance] imply an average 10-year default probability that is 3.5 times higher than that implied by the reported ratings." *Id.* at 2-3; *see also id.,* at 12.

71.     Thus, in the event of a significant market event – for example, the 2008 collapse of Lehman Brothers and the severe ensuing economic slump that depressed market values – insurers' capital buffers may be insufficient to cover policyholder claims. This risk is even greater in the event of severe widespread mortality as caused by, for example, a terrorist attack.

72.     Compounding these risks, the Financial Stability Oversight Council has designated some life insurers, including Defendant's parent, as "systemically important" financial institutions ("SIFIs"). *See* FRB Staff Report at 3. The SIFI designation raises the stakes in the event of a financial crisis. Life insurance companies like Defendant that have been designated as SIFIs pose a risk, not only to their policyholders, but to the financial system as a whole. The collapse of a SIFI would have devastating effects on the economy. For this reason

18

as well, the outsized misrepresentation of life insurers' financial conditions is important to remedy.[11]

## METLIFE'S LIFE INSURANCE BUSINESS

73. MetLife, Inc., Defendant's parent company, operates one of the largest life insurance programs in the country.

74. Defendant is one of MetLife Inc.'s wholly-owned subsidiaries and its flagship operating company.

75. Defendant provides life insurance to individuals, as well as group insurance, retirement and savings products, and services to corporations and other institutions.

76. Much of Defendant's business, including its reinsurance activity, involves transactions with affiliate institutions within the MetLife insurance group.

77. The operating companies within the MetLife insurance group are all well-rated by the rating agencies – a fact that is prominently displayed on the MetLife website:

| | A.M. Best Company | Fitch Ratings | Moody's Investors Service | Standard & Poor's |
|---|---|---|---|---|
| American Life Insurance Company | Not Rated | Not Rated | A1 | AA- |
| First MetLife Investors Insurance Company | A+ | Not Rated | Not Rated | AA- |
| General American Life Insurance Company | A+ | AA- | Aa3 | AA- |
| MetLife Insurance Company USA* | A+ | AA- | Aa3 | AA- |
| Metropolitan Life Insurance Company | A+ | AA- | Aa3 | AA- |
| MetLife Insurance K.K. (MetLife Japan)** | Not Rated | Not Rated | Not Rated | AA- |
| New England Life Insurance Company | A+ | AA- | Aa3 | AA- |

*See* https://www.metlife.com/about/corporate-profile/ratings/index.html (providing ratings as of Nov. 17, 2014) (last visited Jan. 29, 2015), attached as Exhibit 3.

---

[11]In being designated as a SIFI, Defendant's parent is obligated to maintain higher reserves than it otherwise would. MetLife, Inc.'s response has been to rebel against the designation and sue the federal government to remove the designation. This action further demonstrates that Defendant and its parent desire to keep reserves as low as possible.

78.    With regard to the ratings, MetLife, Inc. states:

> MetLife, Inc. and its subsidiaries [including Defendant] have obtained financial strength ... ratings from various ratings agencies.  Insurer financial ratings represent the opinions of ratings agencies regarding the ability of an insurance company to pay obligations under insurance policies and contracts in accordance with their terms . . . .

*Id.*

79.    In addition, MetLife touts its "capital strength" on its website.  *See* Company Profile – "MetLife Today" (attached as Exhibit 4), *available at* https://www.metlife.com/about/corporate-profile/metlife-history/metlife-today/index.html (last visited Jan. 29, 2015).

80.    As evidenced by these statements, MetLife knows that its perceived financial condition is strongly correlated to sales of its insurance products, including life insurance.

## METLIFE ENGAGED IN SHADOW INSURANCE TRANSACTIONS

81.    MetLife reinsures its life insurance risks through both affiliates and third-party reinsurance companies, but MetLife has been heavily reliant on affiliated captives and offshore reinsurance companies.

82.    The reinsurance arrangements and agreements that were developed by Defendant in the wake of New York's adoption of Regulation XXX and its own version of Actuarial Guideline 38, also known as Regulation AXXX, enabled Defendant to free up capital that it then used to invest in other aspects of Defendant's business.

83.    Indeed, in 2005, Roberto Baron, then Vice President and Senior Actuary at MetLife, gave a presentation detailing MetLife's plan for its reserving strategies in light of the XXX and AXXX regulation and guidelines.  *See* "Baron Presentation" (attached as Exhibit 5).

20

84.     The presentation notes an issue due to a "difference of opinion" on the issue of reserves as between regulators and the company.  Baron specifically noted the "huge" numerical differences between the reserves required under statutory versus economic reserve measures. Indeed, the "XXX/AXXX reserves can be 5-20 times larger than GAAP/economic reserves." Thus, the "statutory reserve requirements result in significant capital requirements vs. economic performance."



Baron Presentation, at 11 (demonstrating "hump back" reserves caused by the XXX/AXXX regulations).

85.     Baron discussed three potential strategies to address this perceived financial strain on the company:  (1) retention/internal financing; (2) third-party reinsurance; and (3) captive reinsurance, including letters of credit and special-purpose funding.

86.     The first option, retention/internal financing, did not solve the identified issue. Retention and internal financing required MetLife to make a tradeoff between 7% returns or

400% leverage – neither of which were desirable. The 7% return was too low and the 400% leverage would have had a significant and adverse effect on MetLife's credit ratings.

87.     In discussing the second option, third party reinsurance, Baron noted that in the market as of 2005, there was much less capacity available as compared to the historical norm. Moreover, historically, there was very little capacity available for AXXX reserves. The implication was that third-party reinsurance could not solve MetLife's needs.

88.     The Baron presentation then turned to the use of captive reinsurance using on-shore and/or off-shore captive reinsurers. Baron noted that such transactions required collateral in the form of LOCs or assets in trust, and noted that LOCs were already in use to cover "significant amounts of in-force business." Baron predicted that LOCs as collateral for captive reinsurers would "ultimately solve 30%-50% of the problem."

89.     To supplement the use of LOCs, Baron also discussed the use of "special purpose funding." Specifically, he discussed the raising of funds to populate a reinsurance collateral trust owned by the captive reinsurer. The concern with this model was the leverage characterization, meaning that characterization could result in treatment that was no different than other debt and therefore, would have similar problems to internal financing. If appropriately characterized, however, this securitization funding option had the "potential for significant volume."[12]

90.     The captive reinsurance discussion in the Baron presentation described, in broad terms, Defendant's captive reinsurance transactions both immediately prior to and after the presentation.

91.     Baron's presentation was not hypothetical. At the time of the presentation, Defendant already had engaged in several reinsurance transactions that came within the scope of

---

[12] The apparent solution for this "characterization" issue was for MetLife to utilize special purpose captives in jurisdictions that did not disclose the parental indemnifications and Total Rate of Return Swaps detailed herein.

the NYDFS's "shadow insurance" investigation.

92.     MetLife is identified in the June 2013 NYDFS report as "Case 1."

93.     The NYDFS Report examined the financial condition and reserves of MetLife.

94.     The NYDFS Report determined that MetLife had diverted reserves for purposes other than paying policyholder claims, thereby yielding a deceptively high RBC ratio.

95.     For example, Defendant derived reserve credit from four LOCs totaling $1,184,000,000 that were used by its captive affiliate, MetLife Reinsurance Company of Vermont ("MRV"), and its offshore affiliates Exeter Reassurance Company Ltd. ("Exeter")[13] and Missouri Reinsurance (Barbados), Inc. *See* Metropolitan Life Insurance Company 2011 Annual Statement ("2011 Annual Statement").  Defendant did not disclose that these LOCs were backed by "contractual parental guarantees."  The consequence of these guarantees was that the reinsurance agreement did not actually transfer all of the risk that was represented in Defendant's regulatory filings.  In the event that the affiliated captives were unable to pay all subject policyholder claims, the obligations would be carried by the ultimate parent by virtue of the parental guarantee.[14]

96.     Included in the $1.184 billion in LOCs backed by parental guarantees was a $315 million LOC that the NYDFS determined was reported as an admitted asset on the books of MRV.  In addition, the NYDFS identified additional LOCs reported by MRV as admitted assets in connection with reinsurance arrangements with Defendant's affiliate life insurance companies.  These additional LOCs carried by MRV on its books totaled $4.1 billion.  These LOCs backed

---

[13] In 2013-2014, MetLife, Inc. reorganized several subsidiaries.  As part of the reorganization, MetLife, Inc. repatriated Exeter from the Caymans to Delaware.
[14] As described *supra* at ¶¶ 20-21 & n.2, the financial wellbeing of Defendant is substantially related to the financial wellbeing of Defendant's parent, MetLife.

by contractual parental guarantees are quintessential examples of the "hollow assets" that the NYDFS identified as an improper shadow insurance practice.

97.     Defendant also derived reserve credit from a reinsurance treaty with an affiliate that was partly funded by $1.85 billion in surplus notes that the affiliate issued but that were indemnified by MetLife, Inc. via a "Total Rate of Return Swap." The Total Rate of Return Swap entailed an agreement whereby MetLife exchanged with a third party the "difference between the economic risk and reward [of the surplus notes] and the [LIBOR], calculated by reference to an agreed notion principal amount." *See* NYDFS Report at 10; *see also* MetLife, Inc., Form 10-K for the fiscal year ended December 31, 2011, at F-77. Thus, like the $1.184 billion in parental guarantees concerning the LOCs, the parental indemnification of the performance of these surplus notes caused the reinsurance transaction to not actually transfer all of the risk that was represented in Defendant's regulatory filings.

98.     In addition to the $1.85 billion in surplus notes indemnified by the ultimate parent, the NYDFS Report identified an additional $2.797 billion in surplus notes/trust indemnification that could potentially result in the parent – MetLife, Inc. – being obligated to pay claims in the event of the captive reinsurer's default.

99.     As a result of the reinsurance transactions that used the $1.184 billion of LOCs backed by parental guarantees and the $1.85 billion in surplus notes indemnified by the parent, Defendant improved its RBC by 109% as of 2011. *See* NYDFS Report at 10.

100.     Defendant's total capital and surplus for the year ended December 31, 2011 was $13,506,769,111. *See* 2011 Annual Statement at 22. The $3,034,000,000 total reserve credit that Defendant improperly took on the basis of the $1.184 billion in LOCs with parental guarantees and the $1.85 billion in surplus notes the performance of which was indemnified by

Defendant's parent constituted approximately 22% of Defendant's total surplus and capital at year end. *See also* NYDFS Report at 10.

101.    The NYDFS Report also determined that $5.9 billion in LOCs were held by other non-New York affiliates of Defendant that were also guaranteed by the parent. *See* NYDFS Report at 10. These non-New York affiliates increased their individual RBC ratios by between 211.3 and 634 percent each in 2011. *Id.*

102.    As a result of these shadow insurance transactions and practices, the NYDFS Report found that the insurance group artificially increased its RBC ratio 150.8% on a consolidated basis. *Id.*

103.    In addition, the NYDFS Report found that Defendant engaged in TSTs where Defendant ceded risks to non-New York-based affiliated companies which then retroceded all or part of that risk to company-affiliated captives. *See* NYDFS Report at 7.

104.    As noted above, the FRB Staff Report applied adjustments to the RBCs of life insurance companies that engage in shadow insurance and found that, on average, the RBC should be reduced by 53% to account for the effect of the shadow insurance transactions, and their ratings should be reduced by three notches.  This means that, on average, life insurance companies engaging in shadow insurance transactions artificially inflated their RBCs by approximately 112.8%.   The NYDFS found that Defendant inflated its RBC by 109%. Additionally, the NYDFS found that Defendant's insurance group as a whole inflated its RBC by 150%. Thus, Defendant's rating was likely inflated by three notches or more.

105.    Therefore, Defendant's true rating, if the nature of its financial condition and reserves was fully and truthfully disclosed, was likely at least three notches below its reported ratings for the years in which these transactions were undisclosed.

106.   This gap between the true rating and the actual rating is significant and material.

107.   Additionally, a review of Defendant's statutory filings in 2011 demonstrates that the reported reserve credits taken with respect to these shadow insurance transactions were significant and material. Indeed, Defendant's 2011 Schedule S, Part 4 – which reports various aspects of reinsurance transactions with unauthorized companies – shows that Defendant took a reserve credit of $2,947,745,838 with MRV, Exeter, and Missouri Reinsurance (Barbados), Inc.

108.   In response to the NYDFS Report, MetLife stated that it "holds more than sufficient reserves to pay claims on its policies," and added that it used reinsurance subsidiaries "as a cost-effective way of addressing overly conservative reserving requirements" for certain insurance products. *See* Mary Williams Walsh, *Insurers Inflating Books, New York Regulator Says*, New York Times: DealB%K, June 11, 2013, available at http://dealbook.nytimes.com/2013/06/11/insurers-inflating-books-new-york-regulator-says/ (last visited Jan. 26, 2014). The New York Times reported that MetLife further stated that if it had to set aside the level of reserves demanded by the NYDFS more conventionally, it would either have to borrow (putting its credit rating at risk) or raise the money by selling stock, dragging its returns below the level its stockholders require. *Id.*

109.   Importantly, MetLife's response did not deny the parental guarantees that were the basis of the NYDFS Report's findings, nor that these guarantees were concealed and undisclosed (which they were). MetLife also did not deny the conduct that was detailed in the report or indicate that it would cease engaging in such conduct.

110.   By engaging in the shadow insurance transactions at issue in this action, and by failing to properly disclose those transactions (while at the same time touting its financial strength), Defendant violated New York law, misrepresented its financial condition and reserves,

26

and misled its primary regular, its credit rating agencies, and its customers.

111.   Regardless of whether Defendant believes that its reserves are sufficient to pay claims, its conduct was unlawful.  That its stockholders desire better returns is not an excuse and does not absolve Defendant of liability under law.

## CLASS ACTION ALLEGATIONS

112.   Plaintiff seeks certification of the following Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3):[15]

> All persons and entities who purchased, renewed, or paid premiums on life insurance issued by MetLife on or after February 2, 2009 (the "Class")

113.   This Class excludes any individual life insurance policies on which death benefits have been paid in full.  The Class also excludes any parent, subsidiary, or affiliate of Defendant, any entity in which Defendant has a controlling interest, or any entity that is controlled by or controls Defendant, along with such entities' officers, directors, employees, legal representatives, heirs, predecessors, successors, and assigns.

114.   The members of the Class are so numerous that joinder is impracticable, and the disposition of their claims in this case and as part of a single class action lawsuit, rather than numerous individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent.

115.   The members of the Class are ascertainable from Defendant's records and/or records of third parties accessible through discovery.

116.   Plaintiff is a member of the Class, and Plaintiff's claims are typical of the claims of the Class members it seeks to represent.

---

[15] Plaintiff reserves the right to propose other or additional classes or subclasses in its motion for class certification, after discovery.

117.     Plaintiff will fairly and adequately represent the members of the Class and has no interests that are antagonistic to the claims of the Class.  Plaintiff will vigorously pursue the claims of the Class.

118.     Plaintiff has retained counsel who are competent and experienced in class action litigation, and have successfully represented plaintiffs in complex class actions, including in numerous actions concerning complex insurance products and schemes.

119.     Common questions of law and fact impact the rights of each member of the Class, and a common remedy by way of statutory damages and/or injunctive relief is sought for the Class.

120.     There are numerous and substantial questions of law and fact common to all members of the Class which predominate over any individual issues.  These common questions of law and fact include, without limitation:

    a.   The nature, scope and operation of Defendant's shadow insurance transactions, including, without limitation, the parental guarantees backing LOCs issued as collateral for affiliated reinsurance transactions and the indemnification by its parent of surplus notes used to partly fund affiliated reinsurance transactions (collectively "Defendant's shadow insurance transactions");

    b.   The effect of Defendant's shadow insurance transactions on its financial condition;

    c.   Whether Defendant artificially inflated its RBC ratio and the RBC ratio of its insurance group by engaging in the type of shadow insurance transactions described herein;

    d.   Whether Defendant's shadow insurance transactions artificially inflated the ratings that Defendant received from its principal ratings agencies;

    e.   Whether Defendant concealed the nature, scope and operation of its shadow insurance transactions;

    f.   Whether Defendant misrepresented its financial condition or reserves, or made misleading representations as to its financial condition or reserves;

28

      g.   Whether Defendant's conduct as described in this Complaint violates New York Insurance Law Section 4226.

      h.   The proper measure of statutory damages for the alleged violations

121.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Trial of Plaintiff's claims and the Class members' claims is manageable.

122.    There is no plain, speedy or adequate remedy other than by maintenance of this action as a class action.  It is economically unfeasible to pursue remedies other than by way of a class action.

123.    Plaintiff is unaware of any difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

124.    Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.  Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendant.  Without a class action, Defendant likely will retain the benefit of its wrongdoing and will continue a course of action in violation of law.

## CAUSES OF ACTION

### COUNT1
### Violation of New York Insurance Law Section 4226
### (Asserted Against Defendant on Behalf of Plaintiff and the Class)

125.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

29

126.   Pursuant to New York Insurance Law Section 4226, insurers are prohibited from making misleading representations or misrepresentations of their financial condition or of the legal reserve system on which they operate.

127.   Specifically, Section 4226(a) provides:

> No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall: . . . (4) make any misleading representation, or any misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates . . . .

128.   MetLife knowingly engaged in several shadow insurance transactions to relieve capital strain caused by reserve requirements that it believed were excessive, and to misleadingly represent its true financial condition and reserves.

129.   MetLife entered into these shadow insurance transactions knowing that they would not meet New York's statutory reserve requirements, and structured the transactions with captive affiliates to evade these requirements.

130.   MetLife ensured that the nature of the transactions (*e.g.*, the use of contractual parental guarantees on LOCs that served as collateral for the transactions and the use of surplus notes that were indemnified by the ultimate parent) would not only be concealed from the NYDFS but also would be concealed from its rating agencies and customers. By concealing and not disclosing the parental guarantees and indemnifications, MetLife ensured that its captive reinsurance financing scheme would not cause its credit rating to fall.

131.   MetLife further engaged in these transactions knowing that, by concealing the nature of these transactions and claiming reserve credits, its RBC ratio would be artificially inflated. These manipulations of the RBC ratio were willfully and knowingly

withheld and concealed from MetLife's home state regulator, rating agencies, and customers.

132. MetLife knew that the ratings issued by the rating agencies on its life insurance products were based in significant part on the RBC ratio which it was actively manipulating. Yet, it touted those ratings to its customers and otherwise touted its financial condition.

133. Furthermore, MetLife knowingly failed to disclose the TSTs in which it engaged. As reported by the NYDFS, MetLife entered into reinsurance transactions with affiliates that then retroceded all or part of the risk to a captive affiliate in transactions that were otherwise improper shadow insurance transactions. MetLife engaged in these transactions to further evade NYDFS requirements. MetLife's failure to disclose these TSTs was done knowingly to conceal its true financial condition and reserves.

134. By engaging in the conduct set forth herein, MetLife knowingly misled its home state regulator, its ratings agencies, and the public – including Plaintiff and the Class – as to its financial condition including, without limitation, its default risk, and as to the legal reserve system on which it operates. These knowing misrepresentations violated New York Insurance Law Section 4226.

135. Further, the conduct described herein made MetLife's affirmative representations regarding its financial condition, including the representations set forth above in Paragraphs 77-79, and the representations in its financial and regulatory statements, materially misleading. MetLife knew these statements were materially misleading, but willfully made such statements and recklessly failed to correct or qualify them.

31

136.   MetLife charges its policyholders premiums in return for the life insurance policies it issues.

137.   The payors of these premiums – including Plaintiff and the Class – are "aggrieved" persons under New York Insurance Law Section 4226(d).  Plaintiff and the Class paid premiums for Defendant's life insurance policies.  Plaintiff and the Class purchased these policies and paid these premiums based, in part, on Defendant's perceived financial strength, and based on the assumption that Defendant was in compliance with the regulations of its home state regulator and earned the ratings that it received from credit reporting agencies.

138.   The fact that Defendant concealed its shadow insurance transactions and misrepresented its financial condition means that the quality of the policies purchased by Plaintiff and the Class is not what was represented, and that Plaintiff and the Class paid more for these lesser quality policies than they otherwise would have, thereby injuring Plaintiff and the Class.  In any event, Section 4226 does not require that a purchaser of a covered insurance policy sustain or claim to have sustained damage or injury prior to bringing suit.

139.   The New York Insurance Regulations pertaining to reinsurance arrangements make clear that reinsurance transactions that do not transfer all of the significant risks of insurance policies being reinsured are inappropriate.  Specifically, the Regulations state that "it is improper for an authorized insurer, in the capacity of ceding insurer, to enter into reinsurance agreements for the principal purpose of producing significant surplus aid for the ceding insurer, while not transferring all the significant risks inherent in the insurance policies being reinsured." 11 N.Y. Comp. Codes R. & Regs. § 127.0(b).

140.   The NYDFS has taken the position that where "an authorized ceding insurer [such as Defendant] takes reserve credit by reducing liabilities or establishing assets for reinsurance

32

ceded under [reinsurance agreements that do not transfer all the significant risks], that ceding insurer would . . . distort[] its financial statements and not properly reflect its financial condition." *Id.* § 127.0(c)(2).

141.   Defendant has done just that.   Defendant purposefully engaged in secret and improper reinsurance transactions, which did not result in a full transfer of risks, in order to present a distorted picture of its financial condition and reserves to its home state regulator, its rating agencies, and its customers.   This conduct violates Section 4226 of the insurance code.

142.   Due to Defendant's violations of Section 4226, Plaintiff and the Class are entitled to "a penalty in the amount of such premium or compensation" and other appropriate relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment entering the following relief:

a)   Certifying the proposed Class under FED. R. CIV. P. 23(b)(2) and (b)(3), appointing Plaintiff as the class representative for the Class, and appointing Plaintiff's counsel as class counsel;

b)   Awarding injunctive relief requiring Defendant to fully disclose the nature and extent of its shadow insurance transactions to regulators, ratings agencies, and the public;

c)   Awarding statutory damages to the fullest extent permitted under the law;

d)   Awarding a penalty in the amount of the premiums paid to Defendant during the relevant time period by Plaintiff and the Class for their life insurance policies, as provided by law;

e)   Awarding Plaintiff his litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

33

f)   Awarding all other relief as this Court may deem proper and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all claims so triable.

February 2, 2015

Respectfully submitted,

_____
John D. Zaremba
ZAREMBA BROWNELL & BROWN PLLC
The Trump Building
40 Wall Street, 27th Fl.
New York, NY 10005
Telephone: (212) 380-6700
Email: jzaremba@zbblaw.com

H. Laddie Montague, Jr.
Shanon J. Carson
Glen Abramson
Patrick Madden
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: hlmontague@bm.net
       scarson@bm.net
       gabramson@bm.net
       pmadden@bm.net

Kai H. Richter
NICHOLS KASTER, PLLP
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3278
Facsimile: (612) 215-6870
Email: krichter@nka.com

*Attorneys for Plaintiff*

34